**UNITED STATES DISTRICT COURT**
**FOR THE**
**WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| JUAN JOSE PEREZ-HERNANDEZ,<br><br>Plaintiff,<br><br>v.<br><br>J.P. MORGAN CHASE BANK, N.A.,<br><br>Defendant. | ) | Case No.<br><br><br><br>**PLAINTIFF'S COMPLAINT AND JURY DEMAND** |

Hendricks Spaak Law, PLC
Teresa M. Hendricks (P46500)
Attorney for Plaintiff
1 Coldbrook St. NW, Suite 110
Grand Rapids, MI 49503
(616) 956-1900
teresa@hsatty.com

Plaintiff Juan Jose Perez-Hernandez, by and through counsel, Hendricks Spaak Law, PLC, states this Complaint against Defendant JPMorgan Chase Bank, N.A. ("Chase") as follows:

## NATURE OF THE ACTION

1. This is a civil action arising from Defendant **JPMorgan Chase Bank, N.A.'s** freezing, suspension, seizure, retention, and refusal to return approximately **$149,977.23** in funds belonging to Plaintiff **Juan Jose Perez-Hernandez**.
2. The funds consist of approximately **$145,000.00** in proceeds from deposited checks and approximately **$4,977.23** in Plaintiff's money that was already in the account before the check deposits at issue.

3. Plaintiff brings claims for **statutory conversion** under MCL 600.2919a, violation of the **Elliott-Larsen Civil Rights Act** ("ELCRA"), MCL 37.2302, violation of the **Expedited Funds Availability Act** and **Regulation CC**, **common-law conversion**, and **breach of contract**.

4. Plaintiff pleads Regulation CC and the Expedited Funds Availability Act both as a direct federal claim to the extent Defendant's conduct violated requirements subject to civil liability under 12 U.S.C. § 4010 and 12 C.F.R. § 229.21, and as evidence that Defendant knew the difference between a temporary, legally justified check hold and an indefinite seizure of cleared customer funds after account closure.

## PARTIES

5. Plaintiff **Juan Jose Perez-Hernandez** is an adult individual residing in Kent County, Michigan.

6. Plaintiff is Hispanic, of Mexican national origin or descent, and his primary language is Spanish.

7. Plaintiff uses an IRS-issued Individual Taxpayer Identification Number ("ITIN") for banking purposes.

8. Defendant **JPMorgan Chase Bank, N.A.** is a national banking association that does business in Kent County, Michigan and throughout the State of Michigan.

9. Defendant offers banking, deposit-account, check-deposit, funds-transfer, account-closing, funds-release, and related financial services to the public.

## JURISDICTION AND VENUE

10. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because Plaintiff asserts a claim arising under the Expedited Funds Availability Act and Regulation CC, including 12 U.S.C. § 4010 and 12 C.F.R. § 229.21.

11. This Court also has subject-matter jurisdiction under 28 U.S.C. § 1332 because Plaintiff is a citizen of Michigan, Defendant is a national banking association whose citizenship is outside Michigan for diversity purposes, and the amount in controversy exceeds $75,000 exclusive of interest and costs.

12. The amount in controversy exceeds $75,000 because Defendant retained approximately **$149,977.23** in Plaintiff's funds, and Plaintiff seeks actual damages, treble damages under MCL 600.2919a, emotional-distress damages under ELCRA, costs, attorney fees where authorized, interest, and other relief permitted by law.

13. Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in Kent County, Michigan, within the Western District of Michigan, and Defendant conducts business in this District.

14. This Court has supplemental jurisdiction over all related state-law claims under 28 U.S.C. § 1367 to the extent supplemental jurisdiction is necessary.

## GENERAL ALLEGATIONS

15. Plaintiff has lived in Kent County, Michigan for many years and operates construction business.

16. Plaintiff maintained a deposit-account relationship with Defendant Chase for years.

17. As part of that relationship, Plaintiff deposited checks received in the ordinary course of his construction work into his Chase account.

18. Defendant accepted Plaintiff's construction-related check deposits and established a course of dealing under which Plaintiff deposited checks into his Chase account and Defendant processed those checks for deposit.

19. Plaintiff's Chase deposit account included account number ending in **2273**.

20. Ana Beatriz Ramirez Cordova was listed on the account, but had no ownership interest, possessory interest, equitable interest, beneficial interest, or other property right in the funds at issue.

21. Ms. Ramirez Cordova had separated from Plaintiff approximately six years before the events at issue and left no funds in the account.

22. Plaintiff does not assert claims on behalf of Ms. Ramirez Cordova and does not name her as a plaintiff because the funds at issue belonged to Plaintiff and not to Ms. Ramirez Cordova.

## ACCOUNT AGREEMENT AND DEPOSITS

23. Defendant and Plaintiff were parties to a Deposit Account Agreement governing the deposit relationship, account closure, deposits, account restrictions, setoffs, and Defendant's duties when holding or returning account funds.

24. The Deposit Account Agreement allowed Defendant to close an account, but required Defendant, upon closing an account, to return the balance less any lawful fees, claims, setoffs, or other amounts.

25. The Deposit Account Agreement did not authorize Defendant to permanently confiscate, indefinitely suspend, or retain Plaintiff's cleared funds for Defendant's own use without legal justification.

26. The Deposit Account Agreement also did not negate Defendant's duties under applicable law to act in good faith and with reasonable care.

27. Before the check deposits at issue, Plaintiff already had funds in the Chase account. Upon information and belief, approximately **$4,977.23** of the total amount later placed in suspense was Plaintiff's money already in the account and not proceeds of the three deposited checks.

28. In June 2023, Plaintiff deposited multiple checks payable to him or his business interests from **Estrella Construction, LLC**, including large checks drawn on Bank of America.

29. The checks included, among others:

| Check | Drawer | Date | Amount |
|---|---|---|---|
| No. 1426 | Estrella Construction, LLC / Bank of America | June 2023 | $45,000.00 |
| No. 1435 | Estrella Construction, LLC / Bank of America | June 8, 2023 | $50,000.00 |
| No. 1447 | Estrella Construction, LLC / Bank of America | June 28, 2023 | $50,000.00 |

30. Defendant accepted the checks for deposit.

31. Upon information and belief, the checks were paid by the drawee bank and the proceeds became cleared funds.

32. After accepting the deposits, Defendant restricted Plaintiff's account and suspended Plaintiff's funds.

33. Defendant later admitted in writing that, in July 2023, it restricted Plaintiff's account to allow verification with the maker of multiple large checks deposited to Plaintiff's account.

34. Defendant also admitted in writing that it placed **$149,977.23** in suspense.

35. The suspended amount exceeded the approximately **$145,000.00** in deposited check proceeds because Defendant also took and retained approximately **$4,977.23** of Plaintiff's money that was already in the account.

36. Defendant's seizure and retention of the pre-existing account funds was not a check hold, was not maker verification, and was not tied to collectibility of the deposited checks.

37. Defendant claimed it was unable to complete its verification process because verification required an outbound call to the maker of the checks using a telephone number that conformed with Defendant's internal risk tools.

38. Defendant's inability or refusal to complete an internal risk-tool verification did not transfer ownership of Plaintiff's funds to Defendant.

39. Defendant's inability or refusal to complete an internal risk-tool verification did not authorize Defendant to retain cleared funds for nearly two years.

40. Defendant's inability or refusal to complete an internal risk-tool verification did not authorize Defendant to place Plaintiff's cleared funds into suspense indefinitely, with no meaningful procedure for timely release.

## DEMANDS, ADMISSIONS, AND CONTINUED RETENTION

41. Defendant closed or restricted Plaintiff's account and deprived Plaintiff of access to his money.

42. On or about July 2023, Plaintiff updated his address with Defendant.

43. Plaintiff repeatedly demanded return of his funds beginning in July 2023.

44. Plaintiff, through counsel, sent written demand correspondence to Defendant on or about December 3, 2024, expressly identifying Defendant's conduct as common-law and statutory conversion under MCL 600.2919a, demanding return of the funds, and requesting account records and the Deposit Account Agreement.

Plaintiff's correspondence through counsel had counsel's valid mailing address.

45. Defendant did not promptly return Plaintiff's money after receiving Plaintiff's demands, even while having counsel's address and letter of representation.

46. On or about January 17, 2025, Defendant's Executive Office responded that the funds had been placed in suspense in July 2023 and that Defendant had "reviewed the suspended funds" and "agreed to release them," but refused Plaintiff's request for damages.

47. Defendant's January 17, 2025 correspondence did not identify any lawful setoff, garnishment, lien, levy, court order, fraud finding, chargeback, returned item, or other legal basis for Defendant to retain Plaintiff's funds.

48. Defendant's January 17, 2025 correspondence stated that Defendant would require a valid mailing address before sending the funds, but also stated that the address could be for Plaintiff or that Defendant would agree to send the funds directly to Plaintiff's counsel with counsel's approval, even while Defendant had counsel's valid address and letter of representation.

49. Defendant's January 17, 2025 correspondence refused Plaintiff's request for damages or compensation, even while admitting that Defendant had agreed to release the suspended funds.

50. On or about May 8, 2025, Defendant again wrote that release of Plaintiff's funds had been approved, but that Defendant would not send the funds until it received a current mailing address for Plaintiff or authorization to send the funds to counsel, and did not address Plaintiff's request for damages.

51. Defendant's May 8, 2025 correspondence again failed to identify any lawful setoff, garnishment, lien, levy, court order, fraud finding, chargeback, returned item, or other legal basis for retaining Plaintiff's funds.

52. On or about May 29, 2025 and June 4, 2025, Plaintiff's counsel responded that merely returning Plaintiff's money after nearly two years was inadequate, demanded return of the seized amount trebled under MCL 600.2919a, plus interest and attorney fees, and again placed Defendant on notice that the continued retention was wrongful.

53. On or about June 25, 2025, Defendant stated that it "remains prepared to release" Plaintiff's funds of **$149,977.23**, again conditioned release on confirmation of a current mailing address for Plaintiff or counsel's approval to send the funds directly to counsel, and again refused to address to Plaintiff's demand for payment of damages.

54. On or about June 27, 2025, Plaintiff's counsel again wrote to Defendant, rejected Defendant's position as insufficient, explained that Defendant had identified no basis for the suspension, asserted that Defendant lacked a factual predicate to initiate or continue the suspension, and requested whether Defendant would accept service of process. The correspondence included counsel's valid mailing address.

55. On or about August 15, 2025, Defendant again stated that it was "prepared to release" the funds for **$149,977.23**, again required confirmation of a current valid mailing address for Plaintiff or approval to send the funds directly to counsel, again asserted reliance on the Deposit Account Agreement, and again refused Plaintiff's demand for damages.

56. By August 15, 2025, Defendant had mailed correspondence to Plaintiff's counsel at counsel's valid office address, 1 Coldbrook St. NW, Suite 110, Grand Rapids, Michigan 49503, and had repeatedly communicated with counsel by email and mail at counsel's known address.

57. On or about February 23, 2026, Plaintiff's counsel responded to Defendant's August 15, 2025 letter and expressly instructed Defendant to release the funds by check made payable jointly to Plaintiff and counsel's firm, and to mail the check to Hendricks Spaak Law, 1 Coldbrook St. NW, Suite 110, Grand Rapids, Michigan 49503.

58. Plaintiff's counsel's February 23, 2026 letter provided the very address and authorization Defendant had repeatedly claimed to require to release the funds.

59. Instead of releasing the funds after receiving counsel's February 23, 2026 written authorization and address, Defendant changed its position.

60. On or about March 23, 2026, Defendant stated that, in accordance with its standard procedures, the funds would be returned to the check maker as reflected on the original checks, and that Plaintiff would need to call Defendant's Fraud Hotline and provide debit authorization on a recorded line.

61. Defendant's March 23, 2026 correspondence stated that Defendant had attempted to contact counsel and Plaintiff, and that Defendant was "closing the case," and that

Plaintiff's next step was to contact Defendant's Fraud Hotline at 1-877-691-8086 to complete an authorization process.

62. Defendant's March 23, 2026 position contradicted its prior written statements that release had been approved, that it had agreed to release the funds, and that it would send the funds to Plaintiff or counsel once it received a valid address or counsel's authorization.

63. Defendant's March 23, 2026 position also contradicted Defendant's prior failure to identify any fraud, forgery, setoff, debt, nonpayment, returned item, or lack of check payment as a basis for retaining the funds.

64. Plaintiff's counsel again wrote Defendant on or about April 2, 2026, again authorized release of the full **$149,977.23** made payable jointly to Plaintiff and counsel's firm at counsel's valid postal address, documented Defendant's repeated prior promises to release the funds, and objected that Defendant had changed its story by sending Plaintiff and counsel back to the Fraud Hotline.

65. Defendant's retention of the funds deprived Plaintiff of the use and enjoyment of money belonging to him.

66. Defendant's retention of the funds damaged Plaintiff personally and damaged Plaintiff's construction business.

## REGULATION CC KNOWLEDGE ALLEGATIONS

67. Defendant is a sophisticated national bank that regularly accepts checks for deposit, applies funds-availability policies, evaluates check holds, restricts accounts, closes accounts, and communicates with depositors about availability of deposited funds.

68. Defendant knew the requirements and purposes of the Expedited Funds Availability Act and Regulation CC, including the difference between a temporary exception hold and an indefinite refusal to return cleared funds.

69. Regulation CC's framework recognizes temporary exception holds where a bank has a legally cognizable reason to delay availability, but it does not authorize a bank to convert cleared customer funds to its own use.

70. Defendant's own explanation confirms that its original basis for restricting Plaintiff's account was check-maker verification.

71. Defendant's own explanation further confirms that its continuing retention was not based on a returned item, dishonored check, chargeback, levy, garnishment, court order, or adjudicated fraud.

72. Defendant's own explanation shows that its retention was based on Defendant's internal verification procedure and internal risk tools.

73. Defendant knew that an internal risk-tool issue was not ownership of Plaintiff's funds.

74. Defendant knew that the claimed need to verify a check-maker's telephone number did not permit Defendant to hold Plaintiff's cleared funds indefinitely.

75. Defendant knew that, once it approved release of the funds, its continued withholding of Plaintiff's money was without legal justification.

76. Defendant also knew that once Plaintiff's counsel provided written authorization and a valid mailing address for a joint check to Plaintiff and counsel, Defendant no longer had any good-faith basis to claim it could not release the funds for lack of address or authorization.

77. Defendant's later March 23, 2026 demand that Plaintiff call the Fraud Hotline and provide debit authorization on a recorded line, after repeated prior promises to release the funds, further supports that Defendant's continued retention was knowing, intentional, willful, and in bad faith.

78. Plaintiff pleads these Regulation CC-related facts and knowledge allegations in support of Plaintiff's claims for common-law conversion, statutory conversion, breach of contract, and ELCRA discrimination, and in support of all available damages, fees, interest, and equitable relief.

**DISCRIMINATORY, HOSTILE, AND HARASSING TREATMENT**

79. Plaintiff is Hispanic, of Mexican national origin or descent, Spanish-speaking, and an ITIN-using bank customer.

80. Defendant's internal treatment of Plaintiff's deposits, account closure, suspended funds, and release requests reflected heightened suspicion, hostility, and unequal treatment because of Plaintiff's race, color, national origin, ethnicity, Spanish-language status, and perceived immigrant or ITIN status.

81. Defendant treated Plaintiff as presumptively suspicious and subjected him to prolonged and hostile account restrictions, funds suspension, and release procedures not imposed on similarly situated non-Hispanic, non-Mexican, English-speaking, and Social-Security-number-using customers.

82. Defendant's prolonged refusal to return Plaintiff's funds, shifting or incomplete explanations, reliance on internal risk tools, refusal to provide a meaningful release procedure, repeated rejection of damages and attorney-fee responsibility, and retention

of funds after approving release created a hostile, humiliating, and discriminatory banking environment and banking-service process.

83. Defendant further escalated the hostile and unequal treatment by allegedly attempting to contact Plaintiff directly on or about March 9, 2026 and March 10, 2026 despite knowing Plaintiff was represented by counsel, and by later instructing that Plaintiff had to call Defendant's Fraud Hotline on a recorded line even after counsel had provided written authorization and a valid mailing address for release.

84. Defendant's course of conduct lasted from July 2023 through at least March and April 2026 and deprived Plaintiff of the full and equal enjoyment of Defendant's banking services.

85. Defendant's conduct was severe, prolonged, humiliating, and hostile enough that a reasonable person in Plaintiff's position could conclude that Defendant denied Plaintiff full and equal enjoyment of its banking services because of Plaintiff's protected characteristics.

86. Plaintiff suffered physical, psychological, emotional, business, and economic harm as a result of Defendant's conduct.

87. Plaintiff's emotional and psychological injuries included humiliation, embarrassment, anxiety, loss of sleep, nightmares, severe depression, stress, fear, loss of dignity, and other symptoms and manifestations identified in Plaintiff's psychological evaluation and evidence to be produced in discovery.

88. Plaintiff's ITIN use is pleaded as evidence and a proxy for Defendant's national-origin, ethnicity, Spanish-language, and perceived immigrant-status discrimination; Plaintiff does not plead ITIN use as a standalone protected class under ELCRA.

## COUNT I — STATUTORY CONVERSION — MCL 600.2919A

89. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

90. Plaintiff owned, possessed, and had the right to immediate possession and use of all funds in the Chase account at issue, including approximately **$145,000.00** in deposited check proceeds and approximately **$4,977.23** already in the account.

91. Under MCL 600.2919a(1)(a), a person damaged by another person's stealing property or converting property to the other person's own use may recover three times the amount of actual damages sustained, plus costs and reasonable attorney fees.

92. Defendant stole, took, and wrongfully retained approximately **$4,977.23** of Plaintiff's money that was already in the account and was not part of the deposited check proceeds.

93. Defendant also converted approximately **$145,000.00** in deposited check proceeds to Defendant's own use within the meaning of MCL 600.2919a(1)(a).

94. Defendant's use was for purposes personal to Defendant's interests, including maintaining possession and control of Plaintiff's funds, retaining the benefit of those funds, refusing to release them to Plaintiff, and using the funds as suspended or controlled assets within Defendant's banking operations.

95. Defendant also gained institutional, operational, accounting, regulatory, and financial benefits from holding Plaintiff's funds, including, upon information and belief, carrying the funds on Defendant's books and account ledgers, carrying or classifying the funds within Defendant's suspense-account systems, including the funds in internal account records and control reports, using the funds in testing, monitoring, validating, or justifying Defendant's suspense-department and risk-management procedures,

including the funds in compliance, audit, operational-risk, or regulatory reporting required of financial institutions, increasing or affecting Defendant's reported assets, liabilities, deposits, suspense balances, liquidity, debt-to-asset ratios, reserve calculations, or other internal and external financial metrics, and retaining the benefit of possession while denying Plaintiff all use and benefit of the money.

96. Defendant's wrongful conduct violated duties independent of the general common-law duty not to convert property. Those independent duties included, but were not limited to: Defendant's contractual duties under the Deposit Account Agreement; Defendant's duty to return the account balance after account closure less only lawful fees, claims, setoffs, or other authorized amounts; Defendant's duty to act in good faith and with reasonable care; Defendant's duty to exercise any contractual discretion reasonably and not arbitrarily, capriciously, discriminatorily, or in bad faith; Defendant's duty to follow applicable funds-availability and check-processing laws and regulations; Defendant's duty to provide truthful and non-misleading information concerning the status and release of Plaintiff's funds; Defendant's duty not to use internal risk tools or suspense procedures as a pretext for indefinite retention of customer money; Defendant's duty not to discriminate in the provision of banking services; and Defendant's duty not to take, retain, or use Plaintiff's funds without legal authority after Defendant had approved release.

97. Defendant's liability for statutory conversion does not arise merely from a failure to perform a contract or from a generalized duty to avoid harming Plaintiff. It arises from Defendant's independent statutory, contractual, regulatory, good-faith, reasonable-care, account-closure, disclosure, and non-discrimination duties, and from Defendant's

separate affirmative acts of taking, holding, classifying, carrying, using, and refusing to release Plaintiff's specific and identifiable funds for Defendant's own purposes.

98. Defendant's stealing, taking, conversion, and retention were knowing and intentional.

99. Defendant knew Plaintiff claimed the funds, knew Plaintiff demanded the funds, knew the funds had been suspended, knew release had been approved, knew counsel had provided a valid address and written authorization for a joint check, and knew no lawful setoff, returned item, court order, chargeback, levy, garnishment, adjudicated fraud, maker claim, or claim by any person with a property right in the funds justified continued retention.

100. Defendant's knowledge of Regulation CC, funds-availability law, check-hold limits, its own suspense-account procedures, its own account-ledger systems, its own regulatory reporting obligations, its own internal compliance obligations, its own account-closure obligations, its repeated written release approvals, and its later March 23, 2026 Fraud Hotline/debit-authorization demand further supports that Defendant's stealing and conversion were knowing, intentional, willful, and in bad faith.

101. Defendant's statutory stealing and conversion caused Plaintiff actual damages.

102. Plaintiff is entitled to recover three times the amount of actual damages sustained as a result of Defendant's stealing and conversion, plus costs and reasonable attorney fees under MCL 600.2919a.

## COUNT II — ELLIOTT-LARSEN CIVIL RIGHTS ACT — PUBLIC ACCOMMODATION / PUBLIC SERVICE — MCL 37.2302

103. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

104. Defendant is a banking institution that offers goods, services, facilities, privileges, advantages, and accommodations to the public.

105. Plaintiff sought to use Defendant's banking services, including deposit-account services, check-deposit services, account-access services, funds-availability services, account-closing services, customer-service communications, investigation procedures, and funds-release procedures.

106. Plaintiff was entitled to the full and equal enjoyment of Defendant's goods, services, facilities, privileges, advantages, and accommodations without discrimination because of race, color, or national origin.

107. Plaintiff is Hispanic, of Mexican national origin or descent, Spanish-speaking, and uses an ITIN.

108. Plaintiff's ITIN use is pleaded as evidence and a proxy for Defendant's national-origin, ethnicity, Spanish-language, and perceived immigrant-status discrimination; Plaintiff does not plead ITIN use as a standalone protected class under ELCRA.

## A. DISPARATE TREATMENT — MORE FAVORABLE TREATMENT OF PERSONS OUTSIDE PLAINTIFF'S PROTECTED CLASS

109. Defendant denied Plaintiff the full and equal enjoyment of its banking services by restricting his account, suspending his funds, closing or disabling meaningful account access, refusing to return cleared funds, failing to provide fair and equal procedures for timely release of his money, and subjecting Plaintiff to a prolonged, hostile, humiliating, and discriminatory banking-service process.

110. Plaintiff's race, color, national origin, Spanish-language status, ethnicity, and/or ITIN use as a proxy for national origin, ethnicity, and perceived immigrant status were

motivating factors, substantial factors, or factors that made a difference in Defendant's treatment of Plaintiff.

111. Upon information and belief, Defendant treated similarly situated non-Hispanic, non-Mexican, English-speaking, and/or Social-Security-number-using customers more favorably by not indefinitely suspending cleared funds, by providing meaningful notice and release procedures, by completing verification in a reasonable time, by returning funds upon account closure, and by not subjecting those customers to comparable hostility, suspicion, fraud-hotline requirements, or delay.

112. Upon information and belief, Defendant has engaged in a pattern or practice of heightened scrutiny, account restriction, delayed release, or refusal to return funds involving Hispanic customers, Spanish-speaking customers, immigrant customers, and/or ITIN-using customers.

113. Plaintiff's counsel has a related Michigan state-court case, **Amelia Lili Vasquez Jimenez et al. v. Chase**, currently on appeal, in which Plaintiff alleges that Chase subjected another family with materially similar protected characteristics to near-identical treatment, including risk-tool explanations, a prolonged run-around for more than two years, refusal or delay in releasing customer funds, and shifting procedures or conditions for release.

114. The Vasquez Jimenez matter is not pleaded as conclusive proof of liability in this action. It is pleaded as evidence supporting plausibility, notice, pattern or practice, motive, intent, absence of mistake, and Defendant's knowledge that its treatment of Hispanic, Spanish-speaking, immigrant, and/or ITIN-associated customers was not an isolated occurrence.

## B. TOTALITY OF HOSTILE, HARASSING, AND HUMILIATING TREATMENT — REASONABLE PERSON STANDARD

115. Defendant's course of conduct was severe, prolonged, hostile, humiliating, and discriminatory.

116. Defendant's prolonged refusal to return Plaintiff's funds, shifting or incomplete explanations, reliance on internal risk tools, refusal to provide a meaningful release procedure, repeated rejection of damages and attorney-fee responsibility, retention of funds after approving release, attempted direct contact with represented Plaintiff, and later Fraud Hotline/debit-authorization demand created a hostile, humiliating, and discriminatory banking environment and banking-service process.

117. Defendant's course of conduct lasted from July 2023 through at least March and April 2026 and deprived Plaintiff of the full and equal enjoyment of Defendant's banking services.

118. Under the totality of the circumstances, a reasonable person in Plaintiff's position could conclude that Defendant subjected Plaintiff to hostile, harassing, humiliating, and unequal banking treatment because of Plaintiff's protected characteristics.

119. Defendant's conduct was intentional, willful, discriminatory, and in reckless disregard of Plaintiff's rights, dignity, and sensibilities.

120. Defendant's conduct caused Plaintiff economic damages, loss of use of funds, business damages, humiliation, embarrassment, anxiety, loss of sleep, nightmares, severe depression, emotional distress, psychological harm, loss of dignity, attorney fees and costs where permitted, and other damages.

121. Plaintiff is entitled to recover all damages and relief available under ELCRA and Michigan law, including emotional-distress damages and equitable relief.

## COUNT III — VIOLATION OF THE EXPEDITED FUNDS AVAILABILITY ACT AND REGULATION CC — 12 U.S.C. § 4010 AND 12 C.F.R. § 229.21

122. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

123. Defendant is a depository institution and bank subject to the Expedited Funds Availability Act and Regulation CC.

124. Plaintiff was an affected customer and account holder within the meaning of the Expedited Funds Availability Act and Regulation CC.

125. Defendant accepted checks for deposit into Plaintiff's account, restricted the account, placed funds in suspense, and delayed or refused availability and release of funds.

126. Defendant failed to comply with requirements imposed by the Expedited Funds Availability Act and Regulation CC, including requirements governing availability of deposited funds, exception holds, notice, duration, and handling of funds after the basis for any exception hold had ended.

127. Defendant's own correspondence shows that the original basis for the restriction was maker verification, that the funds were later approved for release, and that Defendant nonetheless continued withholding the funds.

128. Defendant's continued withholding of funds after approving release, after receiving counsel's valid address and authorization, and after shifting to a Fraud Hotline/debit-authorization requirement was not a good-faith Regulation CC hold and was not consistent with the funds-availability framework.

129. Under 12 U.S.C. § 4010 and 12 C.F.R. § 229.21, Defendant is liable to Plaintiff for actual damages, statutory additional damages to the extent available, costs, and reasonable attorney fees for covered violations.

130. Plaintiff brings this claim within the limitations period for violations occurring within one year before filing and alleges continuing or renewed violations through at least March 23, 2026 and April 2, 2026, including Defendant's renewed refusal to release funds without a Fraud Hotline/debit-authorization process after prior release approvals.

131. Defendant's violations caused Plaintiff actual damages, including loss of use of funds, economic harm, out-of-pocket expenses, and other damages.

**COUNT IV — COMMON-LAW CONVERSION**

132. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

133. Plaintiff owned, possessed, and had the right to immediate possession and use of all funds in his Chase account at issue, including the deposited check proceeds and the pre-existing account funds.

134. Plaintiff's funds were specific, identifiable, and traceable funds placed into Defendant's custody through Plaintiff's deposit account, including approximately **$145,000.00** in deposited check proceeds and approximately **$4,977.23** that was already in the account.

135. Defendant wrongfully exercised dominion and control over Plaintiff's funds in denial of, and inconsistent with, Plaintiff's rights.

136. Defendant wrongfully suspended, retained, and refused to return Plaintiff's money after closing or restricting Plaintiff's account.

137. Defendant's own correspondence confirms that Defendant placed **$149,977.23** in suspense and later approved release of the funds.

138. Defendant's continued retention of the funds after approving release confirms that Defendant exercised dominion and control over Plaintiff's money inconsistent with Plaintiff's ownership and right to possession.

139. Defendant converted Plaintiff's funds for Defendant's own use and purposes, including by holding the funds as assets under Defendant's control, retaining the benefit of possession, denying Plaintiff the use of the funds, and preventing Plaintiff from using the funds in his business and personal affairs.

140. Defendant's taking and retention of approximately **$4,977.23** already in Plaintiff's account was an additional wrongful taking distinct from the conversion of the deposited check proceeds.

141. Defendant acted intentionally, willfully, knowingly, and in bad faith.

142. As a direct and proximate result of Defendant's common-law conversion, Plaintiff suffered damages including loss of funds, loss of use, interest, lost opportunity, business losses, emotional distress, out-of-pocket losses, attorney fees and costs where permitted, and other damages.

143. Plaintiff is entitled to recover all damages available for common-law conversion, together with interest, costs, and all other relief permitted by law.

## COUNT V — BREACH OF CONTRACT

144. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

145. Plaintiff and Defendant entered into a contractual deposit-account relationship governed by Defendant's Deposit Account Agreement and related account terms.

146. Plaintiff performed his obligations under the Deposit Account Agreement and related account terms, including by maintaining an account and depositing checks into the account.

147. The Deposit Account Agreement required Defendant, when closing Plaintiff's account, to return the account balance less any lawful fees, claims, setoffs, or other amounts.

148. The Deposit Account Agreement did not authorize Defendant to indefinitely suspend, seize, confiscate, or retain Plaintiff's cleared funds for Defendant's own use without legal justification.

149. The Deposit Account Agreement preserved Defendant's duties under applicable law to act in good faith and with reasonable care.

150. Defendant breached the Deposit Account Agreement by restricting and/or closing Plaintiff's account and failing to return Plaintiff's account balance.

151. Defendant further breached the Deposit Account Agreement by holding Plaintiff's funds in suspense for nearly three years without a lawful contractual basis.

152. Defendant further breached the Deposit Account Agreement by failing to act in good faith and with reasonable care in handling Plaintiff's deposits, account closure, suspended funds, and repeated requests for release.

153. Defendant further breached the Deposit Account Agreement by approving release of Plaintiff's funds but failing to promptly return them.

154. Defendant further breached the Deposit Account Agreement by refusing or failing to release the funds after Plaintiff's counsel provided written authorization and a valid mailing address for a joint check on February 23, 2026.

155. Defendant further breached the Deposit Account Agreement by changing its position on March 23, 2026, by stating that the funds would be returned to the check maker and by requiring Plaintiff to call a Fraud Hotline and provide debit authorization on a recorded line, despite Defendant's prior written statements that it had approved release of the funds to Plaintiff or counsel.

156. Defendant's breaches caused Plaintiff damages, including loss of funds, loss of use, lost business and investment opportunities, out-of-pocket expenses, interest, attorney fees and costs where permitted, and other damages.

157. Plaintiff is entitled to recover all damages caused by Defendant's breach of contract, together with interest, costs, and all other relief permitted by law.

## DAMAGES

158. As a direct and proximate result of Defendant's conduct, Plaintiff suffered damages including, but not limited to:

a. Loss of approximately **$149,977.23** in funds, consisting of approximately **$145,000.00** in deposited check proceeds and approximately **$4,977.23** already in the account;

b. Loss of use of funds;

c. Interest;

d. Lost business opportunities;

e. Lost investment opportunities;

f. Out-of-pocket expenses;

g. Damage to Plaintiff's business operations;

h. Emotional distress, anxiety, humiliation, embarrassment, loss of dignity, loss of sleep, nightmares, severe depression, and other psychological and physical manifestations of distress;

i. Exemplary damages where permitted by law;

j. Treble damages under MCL 600.2919a;

k. Costs and reasonable attorney fees where permitted by statute, contract, court rule, or law; and

l. Other damages to be determined by the trier of fact.

**JURY DEMAND**

Plaintiff demands trial by jury on all issues so triable.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiff **Juan Jose Perez-Hernandez** respectfully requests that this Court enter judgment in his favor and against Defendant **JPMorgan Chase Bank, N.A.**, and award the following relief:

A. Actual, compensatory, consequential, and incidental damages in an amount exceeding **$75,000**, to be proven at trial;

B. Return of all interest on funds wrongfully withheld;

C. Treble damages under MCL 600.2919a for Defendant's stealing and conversion of Plaintiff's funds;

D. Emotional-distress damages, economic damages, equitable relief, and all other relief available under ELCRA;

E. Actual damages, statutory additional damages to the extent available, costs, and reasonable attorney fees under 12 U.S.C. § 4010 and 12 C.F.R. § 229.21;

F. Exemplary damages where permitted by Michigan law;

G. Prejudgment and post-judgment interest;

H. Costs, expenses, and reasonable attorney fees where permitted by law;

I. An order requiring Defendant to correct or retract any negative credit, banking, internal risk, fraud, account-abuse, or consumer-reporting information concerning Plaintiff arising from the transactions alleged in this Complaint;

J. Declaratory relief that Defendant's continued retention of Plaintiff's funds was unlawful; and

K. Any other relief this Court deems just, equitable, and proper.

Respectfully submitted,

**HENDRICKS SPAAK LAW, PLC**
Attorneys for Plaintiff

Dated: 6/24/2026

By: Teresa M. Hendricks
Teresa M. Hendricks (P46500)
1 Coldbrook St. NW, Suite 110
Grand Rapids, MI 49503
(616) 956-1900
teresa@hsatty.com